IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| In re: Scott Lavelle Myer | § | |
| Debtor in Possession | § | CASE NO. 23-40840-btr-11 |
| | § | |
| | § | |
| Scott Lavelle Myer | § | |
| Plaintiff | § | |
| | § | |
| v. | § | ADVERSARY NO. 23-04079 |
| | § | |
| Sarah A. Myer, | § | |
| Defendant | § | |

## AGREED FINDINGS OF FACT AND CONCLUSIONS OF LAW

After receiving testimony in open court on October 3, 2024, and being advised of settlement of all issues between the parties, and the agreement of the parties to these findings of fact and conclusion of law, this Court renders the following findings of fact and conclusions of law:

### Jurisdiction

This Court has jurisdiction over these matters under 28 U.S.C.157(b)(2)(B) and (C) since these are core proceedings Scott and Sarah had know each other since childhood.

### Findings of Fact

1. Scott and Sarah had known each other since childhood.

2. Occasionally, Scott and Sarah's families socialized.

3. Robert Myer, Scott's father, worked in the insurance industry, establishing several successful companies.

**Findings of Fact and Conclusion of Law, Page 1 of 21**

4. By the time Scott and his sister began dating, Scott's parents told both that when they married, their spouse would have to a prenuptial agreement giving up any claim to various assets, primarily trusts, that Scott's parents were establishing for Scott and/or his sister.

5. By 2000, Scott and Sarah had dated.

6. At that time, Scott worked in his family's business and Sarah was a flight attendant for American Airlines.

7. By late 2000 Scott and Sarah began dating frequently.

8. By late 2000 Sarah became pregnant.

9. When Scott learned Sarah was pregnant, Scott asked Sarah to marry him.

10. Shortly after deciding to marry, Scott told Sarah that he could not marry her unless she signed an agreement before the wedding under which Sarah would have no claim to assets created by Scott's family.

11. Sarah was unhappy with the condition of a premarital agreement.

12. Sarah asked Scott's mother, Sharon if Sharon signed a premarital agreement before her marriage to Robert. Sharon told Sarah that Sharon had not signed such an agreement because she and Robert had nothing to protect when they were married and all that they created and acquired came after they were married. Sharon explained the obvious to Sarah, that assets created during her marriage to Robert were significant and that Sarah, as Scott's spouse, was not entitled to any of the assets.

13. Before the signing of the PreNup, Sharon told Sarah that the child would be fully provided for even if Sarah did not marry Scott.

.

14. Sarah, clearly having been told of the condition to marriage to Scott of her executing a premarital agreement excluding her from any of Scott's assets, continued to proceed with wedding plans.

15. Since Sarah and Scott were young and neither understood the assets at issue or the technicalities of a prenuptial agreement, negotiation of the terms of the agreement were handled by Robert and Rodney Ruebsahn ("Rodney"). Rodney was Sarah's stepfather.

16. Robert and Rodney had known each other casually for years, but each had separate business ventures.

17. In the initial conversations, with Rodney, Robert clearly stated that without the execution of a premarital agreement that fully complied with the requirements of Texas law, Scott would not marry Sarah. Rodney understood this condition to the marriage. Rodney did not tell Robert that Sarah would not execute a prenuptial agreement.

18. Thereafter, in virtually all communications with Rodney, Robert reiterated the condition that without the execution of a premarital agreement that fully complied with the requirements of Texas law, Scott would not marry Sarah.

19. Robert advised Rodney of the assets that existed and would be covered by the PreNup and their valuation. Those assets and their values are listed on Exhibit A to the PreNup.

20. Most of the terms of the PreNup were negotiated by Robert and Rodney.

21. After initial conversations and discussions, Robert consulted an attorney with the Akin Gump firm, Timothy P. Tehan ("Tehan"), to represent and to draft a prenuptial agreement.

22. The draft of the PreNup was transmitted to Rodney. Again, Rodney did not state that Sarah would not sign a prenuptial agreement.

**Findings of Fact and Conclusion of Law, Page 3 of 21**

23. Negotiations continued after the initial draft of the PreNup.

24. Rodney engaged Frederick S. Adams, Jr. ("Adams") to represent Sarah in matters related to the prenuptial agreement.

25. By the end of February, 2001, the terms and the form of the prenuptial agreement had been agreed to by Robert and Rodney, except for a request by Rodney for a provision allowing Sarah to be paid $125,000 for attorneys' fees if the marriage ended in divorce (the $125,000 Payment").

26. The agreed terms referenced in the preceding paragraph were incorporated into a draft of the document that became the PreNup and presented in the form of the PreNup.

27. Essentially, those terms rendered all present and future property including increases in value of such property of Scott as separate and of Sarah as separate. The only property that was community property were wages, salaries, fees, commissions, bonuses and other compensation for personal efforts or services rendered by Sarah and/or Scott.

28. Before March 7, 2001, Robert agreed to Rodney's request for the $125,000 Payment. A provision for the $125,000 Payment was inserted into the working draft of the PreNup.

29. With the insertion of the $125,000 Payment the PreNup was finalized and Robert and Rodney agreed that the document was ready for execution.

30. Rodney did not tell Robert that Sarah would not execute the agreement as finally agreed to by Robert, Rodney, Tehan and Adams.

31. Sarah reviewed the PreNup with Adams as described in his letter (the "Adams Letter") dated to her (and signed by her) dated March 14, 2001. Since the meeting with Adams described in the letter occurred in person, the meeting had to have occurred before Sarah left Texas for Breckenridge, Colorado, the site of the ceremony.

32. Robert wanted to execute the PreNup in Texas before everyone left for Breckenridge, Colorado, but Rodney suggested the everyone would be in Breckenridge and execution would be easier.  Robert agree to execute in Breckenridge.  Rodney did not state that Sarah would not execute the PreNup.

33. Everyone was in Breckenridge by March 11, 2001.

34. Initially, all parties were to meet on Monday, March 12, 2001, to sign the documents, but bad weather prevented the Monday meeting.

35. Robert tried to re-schedule the execution for Tuesday, March 13, 2001, but was unable to do so because neither Sarah nor Rodney responded to efforts by Robert to communicate with them.

36. Despite efforts by Robert communications between Rodney and Robert regarding the execution of the agreed PreNup, ceased.  However, neither Rodney, nor Sarah, ever told Scott, Robert, or Sharon, that Sarah would not sign the PreNup.

37. Without having received communications from Rodney, on March 14, 2001, Robert arranged for (a) both attorneys to sign the PreNup, have their signatures notarized and the signed, notarized copies sent  by facsimile to a bank in Breckenridge that Robert used and (b) a letter from (the "Adams Letter") Adams be signed by Adams and sent by facsimile to the same bank.

38. The facsimile documents received at the bank were sent from the offices of Akin Gump in Dallas and Adams in Dallas.  The time stamps on the facsimiles establish that the entire PreNup and Adams Letter were successfully transmitted and received in sequence with no pages out of order.

39. Robert also arranged for a notary in Breckenridge to accompany him to have the PreNup signatures of Scott and Sarah witnessed. Robert and the notary found Sarah having beauty treatment before the wedding.

40. The only persons present were Sarah, Robert, and the notary. The meeting was cordial. Robert gave Sarah the PreNup and the Adams letter and Sarah and Robert discussed the documents. Sarah did not state any concern, objection or reticence to signing the documents.

41. Sarah signed the PreNup, her signature was notarized, and the wedding proceeded on schedule.

42. At no time, including on the day of the wedding, did Scott, Robert, or Sharon threaten any action or inaction or threaten to refuse to perform any legal obligation owed to Sarah.

43. As part of the PreNup Adams swore in the CERTIFICATE OF ATTORNEY FOR SARAH TREADWAY:

> I, Frederick S. Adams, Jr and am an attorney at law, duly licensed and admitted to practice in the State of Texas. I have been employed by Sarah Treadway, I have consulted with Sarah Treadway and advised her of her legal rights and the legal effect of this Agreement in Contemplation of Marriage between her and Stott Lavelle Myer dated the 14th day of March, 2001. I have reviewed the Agreement In Contemplation of Marriage with her clause by clause explaining it to her and answering a any questions that she had concerning it prior to her execution thereof. Furthermore, I have explained to her what her legal rights and obligations would be absent this contractual Agreement in Contemplation of Marriage and under this contractual Agreement in Contemplation of Marriage. Sarah Treadway has acknowledged to me that she bas freely and voluntarily executed this Agreement in Contemplation of Marriage.

44. The sworn statement of Adams is ratified and adopted by Sarah through her signature on the PreNup.

45. The facts stated in Adam's sworn statement on the PreNup are repeated and amplified by the Adams Letter, which Sarah also signed.

46. The Adams Letter establishes that Adams was board certified in family law and for

approximately one week before the execution of the PreNup Adams and Sarah

"discussed" the PreNup "numerous times".

47. The Adams Letter also establishes that Sarah further agreed:

> This letter will further acknowledge that I [Adams] have advised you [Sarah] that
> by executing this Agreement you will, among other things, lose your community
> interest in any income generated by your husband's separate property and any
> income distributions from your husband's trusts.
> You further acknowledge that we have gone through this Agreement paragraph by
> paragraph; that I have explained the legal effect of each paragraph and that you
> have had the opportunity to ask any questions related to any of the paragraphs.
> Lastly, **you will acknowledge that I have warned you that by executing this
> Agreement, you will be waiving your interest in millions of dollars**; however,
> that you understood why your husband's family was insisting on this Agreement
> and that, but for the execution of this Agreement in its present form, the marriage
> would not have occurred and you have elected to execute the Agreement,
> notwithstanding all of the foregoing. (Emphasis added.)

48. Sarah: (a) received counsel from a board-certified family lawyer for a week; (b) that the

lawyer and Sarah (i) reviewed the PreNup "clause by clause"; (ii) with all questions

asked by Sarah discussed and answered;  (iii) discussed the legal rights of Sarah both if

the PreNup was executed and if Sarah did not execute the PreNup; (iv) that by executing

the PreNup Sarah was waiving possible rights and claims to "millions of dollars"; and (v)

by executing the PreNup Sarah  "among other things lose [lost] her community interest in

any income generated by your husband's separate property and any income distributions

from your husband's trusts"; and (c) that all of the assets in which Scott had any

ownership rights or possible future rights as a beneficiary were identified.

49. No fact exists to show that any material item or information was not disclosed to Sarah

and discussed by Sarah with her attorney.

**Findings of Fact and Conclusion of Law, Page 7 of 21**

50. The PreNup renders all property of Sarah and Scott, whether owned on the March 14,

2001, or acquired afterwards, separate property of each with a single exception. The only

exception to property of Scott and Sarah being separate property is stated in paragraph 7

of the PreNup as "…the character of all wages, salaries, fees, commissions, bonuses and

other compensation for the personal efforts of, or services rendered by Husband or Wife

shall not be altered in any manner by this Agreement and shall retain their community

property character."

51. The community property status for "personal efforts or services rendered" applies only to

"wages, salaries, fees, commissions, bonuses and other compensation", which were paid

to Scott for his personal efforts or services rendered.

52. Increases in the value of separate property that arise from the personal efforts or services

rendered are treated separately from the "wages, salaries, fees, commissions, bonuses and

other compensation".

53. Paragraph 6 of the PreNup states the property that the parties agree will be, remain, or

become separate property:

> The parties intend and agree that all property owned by either of them at the time
> of their marriage, all property in which either of them. has any beneficial interest
> (or the possibility of having any beneficial interest whether through exercise of a
> power of appointment or otherwise) at the time of their marriage and all property
> that may come to either of them by gift, devise. or descent during their marriage
> (whether such property be distributed outright to such party or be held in trust for
> the benefit of and later distributed outright to, such party) will be their respective
> separate property. The parties further intend and agree that certain other property
> coming to either of them during their marriage, which otherwise would be
> community property. will belong to their respective separate estates. Both parties
> have the general intent, and do hereby agree to retain and have sole management,
> control and disposition of their respective separate property. Without in any
> manner limiting the remaining specific provisions of this Agreement, it is the
> parties' general purpose, intent, desire, and agreement that, except as may be
> specifically provided herein, (a) each party will continue to own and to manage
> his or her separate property: (b) all income from and all increases in kind or in

value of each party's separate property will be the separate property of the party who owns the separate property that produces such income or increases, (c) all income from and all increases in kind or in value of such separate property and all income from personal efforts will be subject to the sole management and control of the party whose separate property or personal efforts generate the income or increases...

54. Similar language is repeated in paragraph 9.1 of the PreNup in which:

"...partitions, exchanges, transfers and conveys to Husband her community interest in (i) all property (other than salary, wages and other compensation for personal efforts or services rendered and other than income from community property) received by Husband after the date of this Agreement and that otherwise would be community property rather than solely Husband's separate property..."

55. All of Scott's personal efforts or services resulted in the payment of wages.

56. Scott never received any compensation for personal efforts or services except in the form of wages. These wages were covered by W-2 employee taxation.

57. All wages that Scott received were deposited into various accounts on Sarah was a signatory or joint owner.

58. All wages deposit into said account were used to pay family and household expenses.

59. No money was ever transferred from these accounts to any entity in which Scott had a separate property interest.

60. During most, if not all of the marriage, the wages earned by Scott for personal services rendered were less than the living expenses of the family. For example, during the overwhelming portion of the marriage, the family lived essentially for free in houses owned by a trust created by Robert and/or Sharon. Scott and Sarah did not make mortgage, property tax or insurance payments. Additionally, Robert

and/or Sharon loaned or gave Scott and Sarah more than a million dollars that were used directly for the children – for private school tuition or special needs. Scott did not take any reduction in pay for his personal efforts or services in exchange for any of the use of a residence or loans or gifts related to the children.

61. Scott never received any right of any kind, including options, to acquire any interest in any separate property entity.

62. No personal effort or services provided by Scott ever entitled Scott to any ownership interest in any entity, including Equita.

63. The deposition testimony of Eric and Natalie Brennan establishes that Scott was never an owner of Equita.  While Robert owned up to 52% of Equita, Robert, not Scott was the owner.

64. Robert transferred his interests in Equita: ½ to Sagos Trust of which Scott was a beneficiary and ½ to Lagos Trust of which Scott's sister was a beneficiary.

65. Scott is or has been an officer and a director of Atiuqe Financial and Insurance Services, Inc.; Securico Insurance Services, Inc.; Dynamic Insurance Services, Inc.; and FECC Insurance Services, Inc. (collectively the "Corporations").

66. Scott has never owned any stock in any of the Corporations except Securico.

67. Scott has never held any rights, such as options or warrants, to acquire any stock in the Corporations.

68. Securico was formed by Scott and capitalized with a loan from Robert to Scott in the amount of $6,000.

69. After incorporation, Securico could not generate revenue in excess of expenses. Sagos Trust paid amounts that Securico could not pay.  The cumulative amounts paid by Sagos

**Findings of Fact and Conclusion of Law, Page 10 of 21**

Trust were a significant multiple of the $6,000 capitalization of Securico.

70. After several months of funding losses, with no end in sight, Scott transferred the stock in Securico to Sagos and was possibly paid $1,000 which amount was paid to Robert as partial repayment of initial loan.

71. Securico still exists and was not part of the sale of Equita.

72. Scott is a W-2 employee of Dynamic.

73. Dynamic, Securico, and Atiuqe are owned by National Annuities Programs Group, a holding company ("NAP").

74. NAP is owned by the Lagos Trust and Sagos II trust.

75. FECC is wholly owned by Dynamic.

76. Dynamic engages in the business of a marketing company selling insurance by telephone. FECC's principal business is to collect renewal premiums for insurance policies sold years ago by FECC with an occasional sale of a "new" policy.

77. FECC generally no longer engages in sale of insurance policies.

78. Securico's and Atiuqe's present business activities are similar to FECC's.

### Conclusions of Law

1.      Sarah has the burden of proof on all issues except the objection to claim. Functionally, since the objection to claim is based on the validity of the PreNup, Sarah also has the burden of proof with respect to the objection. All of the claims or counterclaims of Sarah that are stated in the Objection to Claim, including fraud on the community, fraud, and reimbursement of the community must be proved by Sarah.

2.      The Court received oral testimony from numerous parties, including Sarah and Scott. This oral testimony at times was inconsistent with statements in documents on March 14,

2001. To the extent that oral testimony is inconsistent with documentary evidence this Court

finds that the oral testimony based on witnesses recollections of events more than twenty (20)

years ago is not reliable and not credible as contradiction to written statements. This Court finds

that the Adams Letter and the PreNup accurately stated the facts related to the execution of the

PreNup and these establish the validity of the PreNup.

      3.      Under Texas law the PreNup is presumed valid. *Beck v. Beck*, 814 S.W.2d 745,

749 (Tex.1991); *Marsh v. Marsh*, 949 S.W.2d 734, 738 (Tex. App.—Houston [14th Dist.] 1997,

no pet.); *Chiles v. Chiles*, 779 S.W.2d 127, 129 (Tex. App.—Houston [14th Dist.] 1989, den.)

      4.  This presumption is rebuttable. *Martin v. Martin*, 287 SW3d 260 (Tex. App 2009).

      5.  Sarah asserts that the PreNup is invalid for the following reasons:

          a.  Sarah was coerced into signing because without Sarah signing the PreNup Scott

             would not have married Sarah;

          b.  affirmative defenses of fraud, fraud on the community and undue influence ; and

          c.   affirmative defenses of (i) ambiguity of the Prenuptial Agreement; (ii)

             unconscionability of the Prenuptial Agreement and (iii) the Prenuptial

             Agreement was not signed voluntarily by Sarah.

      6.      Under V.T.C.A., Family Code, §4.006(c) only two grounds exist to invalidate

the PreNup: (a) under §4.006(a)(1) Sarah did not sign the agreement voluntarily or (b) **each**

of the three elements of §4.006(a)(2) are satisfied, which renders the agreement

unconscionable.

      7.      Whether the PreNup is unconscionable is a matter of law.  §4.006(b).

8. Claims of fraud, fraud on the community, and duress are not independent grounds to invalidate the PreNup, but may be considered in determining whether Sarah's signature was voluntary under §4.006(a)(1).

9. Under *Moore v. Moore,* 383 S.W.3d 190, 195 (Tex App 2012), overlap exists in the factors required for unconscionable and involuntary. The Court in *Moore* identified the overlap as follows:

> In determining whether any evidence of involuntariness existed, this Court has considered (1) whether a party has had the advice of counsel, (2) misrepresentations made in procuring the agreement, (3) the amount of information provided and (4) whether information has been withheld. *See Martin*, 287 S.W.3d at 264–66.

10. Review of the PreNup establishes that Sarah's contentions do not prove involuntary execution of the PreNup and that the PreNup is not unconscionable under §4.006(b).

11. In reviewing the PreNup before execution, Sarah engaged a board certified family attorney, Adams.

12. As part of the PreNup Adams swore in the CERTIFICATE OF ATTORNEY FOR SARAH TREADWAY:

> I, Frederick S. Adams, Jr and am an attorney at law, duly licensed and admitted to practice in the State of Texas. I have been employed by Sarah Treadway, I have consulted with Sarah Treadway and advised her of her legal rights and the legal effect of this Agreement in Contemplation of Marriage between her and Stott Lavelle Myer dated the 14th day of March, 2001. I have reviewed the Agreement In Contemplation of Marriage with her clause by clause explaining it to her and answering a any questions that she had concerning it prior to her execution thereof. Furthermore, I have explained to her what her legal rights and obligations would be absent this contractual Agreement in Contemplation of Marriage and under this contractual Agreement in Contemplation of Marriage. Sarah Treadway has acknowledged to me that she bas freely and voluntarily executed this Agreement in Contemplation of Marriage.

13. The sworn statement of Adams is ratified and adopted by Sarah through her signature on the PreNup.

**Findings of Fact and Conclusion of Law, Page 13 of 21**

14.    The facts stated in Adam's sworn statement on the PreNup are repeated and
amplified by the Adams Letter which establishes that Adams was board certified in family law
and for approximately one week before the execution of the PreNup Adams and Sarah
"discussed" the PreNup "numerous times".

15. The Adams Letter also establishes that Sarah further agreed:

> This letter will further acknowledge that I [Adams] have advised you [Sarah] that
> by executing this Agreement you will, among other things, lose your community
> interest in any income generated by your husband's separate property and any
> income distributions from your husband's trusts.
> You further acknowledge that we have gone through this Agreement paragraph by
> paragraph; that I have explained the legal effect of each paragraph and that you
> have had the opportunity to ask any questions related to any of the paragraphs.
> Lastly, you will acknowledge that I have warned you that by executing this
> Agreement, you will be waiving your interest in millions of dollars; however, that
> you understood why your husband's family was insisting on this Agreement and
> that, but for the execution of this Agreement in its present form, the marriage
> would not have occurred and you have elected to execute the Agreement,
> notwithstanding all of the foregoing.

16.    The statements in sections 14 and 17 above indisputably establish the facts that
before the marriage Sarah:

    a.  received counsel from a board-certified family lawyer for a week;

    b.  that the lawyer and Sarah

        i.  reviewed the PreNup "clause by clause";

        ii.  with all questions asked by Sarah discussed and answered;

        iii.  discussed the legal rights of Sarah both if the PreNup was executed and if
            Sarah did not execute the PreNup;

        iv.  that by executing the PreNup Sarah was waiving possible rights and
            claims to "millions of dollars"; and

        v.  by executing the PreNup Sarah  "among other things lose [lost] her

            community interest in any income generated by your husband's separate

            property and any income distributions from your husband's trusts"; and

       vi.  that all of the assets in which Scott had any ownership rights or possible

            future rights as a beneficiary were identified.

17.     No fact exists to show that any material item or information was not disclosed to Sarah and discussed by Sarah with her attorney.

18.     By signing the PreNup, Sarah adopted the sworn testimony of Adams that Sarah's execution of the PreNup was "free and voluntary".

19.     Paragraph 27 of the PreNup contains Sarah's agreement that she engaged counsel, read the PreNup and was advised of the legal effects of the Pre-Nuptial.

20.     In paragraph 28 of the PreNup Sarah agreed that she had been provided a fair and reasonable disclosure of the property and financial obligations of Scott.

21.     Sarah claims duress based on coercion because Scott would not marry Sarah without Sarah signing the PreNup.

22.     This issue was rejected as a basis to invalidate a pre-nuptial agreement based on an involuntary signing by the Court in *In re AMH* No. 141700908CV (Tex App Sep 17 2019) at p. 13, in which the Court stated: "it [the threatened action not to marry without a signed pre-nuptial agreement] must consist of a threat to do something the threatening party has no legal right to do. *Osorno*, 76 S.W.3d at 511. Here, 'aside from his moral duties,' Michael had no legal duty to marry Kathy. *Id.* 'His threat to do something he had the legal right to do is insufficient to invalidate the premarital agreement.'"

23.     Scott's position that he would not marry Sarah unless the PreNup was signed was "a threat to do something he had the legal right to do".  Accordingly, Scott's actions were not legally coercion of Sarah and any pressure that Sarah felt to choose between signing the PreNup as a precondition to marrying Scott is not duress.

24.     The facts establish that Sarah has no claim either §4.006(a)(1) or §4.006(a)(2).

25.     Sarah produced  no competent evidence that establishes any fact on which this Court could apply the appropriate standards under Texas law to determine that the PreNup is invalid.

26.     Sarah fails in her need to carry the burden of proof to invalidate the PreNup.

27.     The PreNup is valid.

28.     The PreNup does not contain ambiguities and this Court must interpret the PreNup as a matter of law.

29.     Under Texas law the PreNup is to be interpreted under the terms for interpretation of any contract according to the intentions of the parties as expressed in the agreement.  In *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983), the Texas Supreme Court established the rules for construction of the PreNup as follows, "If the written instrument is so worded that it can be given a certain or definite legal meaning or court will construe the contract as a matter of law." (Citations omitted.)  The Texas Supreme Court further stated, "Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Id*. at 394. Finally, the Texas Supreme Court required that the interpretation of a contract not render any particular provision "surplusage" and "that Courts must favor an interpretation that affords some consequence to

each part of the instrument so that none of the provisions will be rendered meaningless." *Id.* at

394. Under the standards established by the Texas Supreme Court this Court.

30.    The PreNup renders all property of Sarah and Scott, whether owned on the March

14, 2001, or acquired afterwards, separate property of each with a single exception.  The only

exception to property of Scott and Sarah being separate property is stated in paragraph 7 of the

PreNup as "…the character of all wages, salaries, fees, commissions, bonuses and other

compensation for the personal efforts of, or services rendered by Husband or Wife shall not be

altered in any manner by this Agreement and shall retain their community property character."

31.    The community property status for "personal efforts or services rendered" applies

only to "wages, salaries, fees, commissions, bonuses and other compensation", which are paid to

Scott for the personal efforts or services rendered.   Increases in the value of separate property

that arise from the personal efforts or services rendered are treated separately from the "wages,

salaries, fees, commissions, bonuses and other compensation".

32.    Paragraph 6 of the PreNup states the property that the parties agree will be,

remain, or become separate property:

> The parties intend and agree that all property owned by either of them at the time
> of their marriage, all property in which either of them. has any beneficial interest
> (or the possibility of having any beneficial interest whether through exercise of a
> power of appointment or otherwise) at the time of their marriage and all property
> that may come to either of them by gift, devise. or descent during their marriage
> (whether such property be distributed outright to such party or be held in trust for
> the benefit of and later distributed outright to, such party) will be their respective
> separate property. **The parties further intend and agree that certain other**
> **property coming to either of them during their marriage, which otherwise**
> **would be community property. will belong to their respective separate**
> **estates.** Both parties have the general intent, and do hereby agree to retain and
> have sole management, control and disposition of their respective separate
> property. Without in any manner limiting the remaining specific provisions of this
> Agreement, it is the parties' general purpose, intent, desire, and agreement that,
> except as may be specifically provided herein, (a) each party will continue to own
> and to manage his or her separate property: (b) all income from and all increases

**Findings of Fact and Conclusion of Law, Page 17 of 21**

in kind or in value of each party's separate property will be the separate property of the party who owns the separate property that produces such income or increases, **(c) all income from and all increases in kind or in value of such separate property and all income <u>from personal efforts</u> will be subject to the sole management and control of the party whose separate property or personal efforts generate the income or increases...** (Emphasis added.)

33. Similar language is repeated in paragraph 9.1 of the PreNup:

...partitions, exchanges, transfers and conveys to Husband her community interest in (i) all property (other than salary, wages and other compensation for personal efforts or services rendered and other than income from community property) received by Husband after the date of this Agreement and that otherwise would be community property rather than solely Husband's separate property...

34.    The PreNup unambiguously distinguishes the treatment of personal efforts and/or services rendered by a spouse based on the benefit received by the spouse. If personal efforts and/or services rendered result in a spouse receiving salary, wages, and other compensation, the property received is treated as community property. If, however, the benefit includes an increase in the value of property that is otherwise separate property under the PreNup, under paragraph 6.(c) and 9.1 the increased value of the separate property is separate property. Under the PreNup the property received by Scott for his personal efforts and services rendered can have a community property component and a separate property component. The separate property treatment occurs to the extent that Scotts personal efforts and service rendered increase the value of separate property of Scott.

35.    *Coker* mandates that PreNup be interpreted to maintain the distinction in property resulting from Scott's personal efforts and services rendered. In the first instance (under the language of paragraph 7 of the PreNups) Scott's personal efforts and

**Findings of Fact and Conclusion of Law, Page 18 of 21**

services rendered resulted in the generation of "wages, salary, fees, commissions, bonuses" or similar compensation.  In the instances when Scott was employed by an entity, all compensations paid to Scott are "wages, salary, fees, commissions, or bonuses" and are community property.

36.     This property was treated as community property because all wages, salary, fees, commissions, bonuses received by Scott were used to pay living expenses of the family.

37.     If the benefit of the same personal efforts and services rendered by Scott was not payment to Scott, but an increase in the value of separate property of Scott, no contradiction or ambiguity exists in the PreNup in treating such value as separate property, because the PreNup looks not to whether personal efforts and services rendered, but to the specific compensation Scott received.

38.     If the results of Scott's personal efforts and services include or are remuneration or payments to Scott, the remuneration or payments are community property.  However, to the extent the results of personal efforts or services rendered by Scott caused an increase in the value of Scott's separate property, those results are separate property.

39.     If Scott's personal efforts and services rendered result in both community and separate benefits, both the community component and separate component exist and are recognized and treated differently under the PreNup.

40.     Any interpretation of the PreNup that renders all benefits of personal efforts and services rendered to be community property cannot be allowed under *Coker* because

**Findings of Fact and Conclusion of Law, Page 19 of 21**

such an interpretation of the PreNup would render paragraphs 6.(c) and 9.1 meaningless

and superfulous.  In *Coker,* at 694, the Texas Supreme Court prohibit any such

interpretation of a contract stating, "Courts must favor an interpretation that affords some

consequence to each part of the instrument so that none of the provisions will be rendered

meaningless."

41.    The interpretation of the PreNup that personal efforts and services rendered

by Scott could result in both community and separate property is the only means to

satisfy the requirements of *Coker*.

42.    Accordingly, to the extent that Scott provided personal efforts and rendered

services that increased in the value of any separate property owned by Scott such

increases would not be community property under the PreNup.

43.    Scott had no legal obligation to the community or Sarah to account for

separate property.  Failure of Scott to account to Sarah for any property in this category is

neither fraud, nor fraud on the community.  Furthermore, since the increases in value

were increases in value of separate property, no reimbursement right exists for the

community.

44.    Since the community component of Scott's personal services and wages

were all placed in the community and used to pay family expenses, there is nothing to

reimburse.

### Conclusion

Based on the foregoing all relief requested by the Plaintiff is the complaint is

GRANTED.

**Findings of Fact and Conclusion of Law, Page 20 of 21**

The Plaintiff's objection to claim number 4 filed by Sarah is GRANTED.

All claims or counterclaims of Sarah in this adversary proceeding and in response
to the objection to claim including, but not limited to claims for reimbursement, fraud,
and fraud on the community are DENIED.

Signed: _____, 2024

Signed on 01/22/2025

*Brenda T. Rhoades* SD

HONORABLE BRENDA T. RHOADES,
CHIEF UNITED STATES BANKRUPTCY JUDGE

**AGREED TO:**

SCHEEF & STONE, L.L.P.
2600 Network Boulevard
Suite 400
Frisco, Texas 75034
Telephone: 214.472.2100
Telecopier: 214.472.2150

By:/s/ Patrick J. Schurr
Patrick J. Schurr
State Bar No. 17853530
Patrick.schurr@solidcounsel.com
Attorney for SARAH MYER


/s/Richard W. Ward
Richard W. Ward
State Bar no. 20846350
rwward@airmail.net
6304 Teal Court
Plano, TX 75024
Telephone: 214.769.8639
Telecopier: 972.630.4850
ATTORNEY FOR SCOTT LAVELLE MYER